18 U.S. 71 (____)
5 Wheat. 71
UNITED STATES
v.
SMITH.
Supreme Court of United States.

*72 February 21st. The Attorney-General, for the United States.
*73 February 25th, 1820. STORY, Justice, delivered the opinion of the court.
The act of congress upon which this indictment is founded provides, "that if any person or persons whatsoever, shall, upon the high seas, commit the crime of piracy, as defined by the law of nations, and such offender or offenders shall be brought into, or found in, the United States every such offender or offenders shall, upon conviction thereof, &c., be punished with death."
*The first point made at the bar is, whether this enactment be a [*158 constitutional exercise of the authority delegated to congress upon the subject of piracies. The constitution declares, that congress shall have power "to define and punish piracies and felonies committed on the high seas, and offences against the law of nations." The argument which has been urged in behalf of the prisoner is, that congress is bound to define, in terms, the offence of piracy, and is not at liberty to leave it to be ascertained by judicial interpretation. If the argument be well founded, it seems admitted by the counsel, that it equally applies to the 8th section of the act of congress of 1790, ch. 9, which declares, that robbery and murder committed on the high seas shall be deemed piracy; and yet, notwithstanding a series of contested adjudications on this section, no doubt has hitherto been breathed of its conformity to the constitution.
In our judgment, the construction contended for proceeds upon too narrow a view of the language of the constitution. The power given to congress is not merely "to define and punish piracies;" if it were, the words "to define," would seem almost superfluous, since the power to punish piracies would be held to include the power of ascertaining and fixing the definition of the crime. And it has been very justly observed, in a celebrated commentary, that the definition of piracies might have been left, without inconvenience, to the law of nations, though a legislative definition of them is to be found in most municipal *codes. The Federalist, No. 4, p. [*159 276. But the power is also given "to define and punish felonies on the high seas, and offences against the law of nations." The term "felonies," has been supposed, in the same work, not to have a very exact and determinate meaning in relation to offences at the common law, committed within the body of a county. However this may be, in relation to offences on the high seas, it is necessarily somewhat indeterminate, since the term is not used in the criminal jurisprudence of the admiralty, in the technical sense of the common law. See 3 Inst. 112; Hawk. P.C. ch. 37; Moore 576. Offences, too, against the law of nations, cannot, with any accuracy, be said to be completely ascertained and defined in any public code recognised by the common consent of nations. In respect, therefore, as well to felonies *74 on the high seas, as to offences against the law of nations, there is a peculiar fitness in giving the power to define as well as to punish; and there is not the slightest reason to doubt, that this consideration had very great weight in producing the phraseology in question.
But supposing congress were bound, in all the cases included in the clause under consideration to define the offence, still there is nothing which restricts it to a mere logical enumeration in detail, of all the facts constituting the offence. Congress may as well define, by using a term of a known and determinate meaning, as by an express enumeration of all the *160] particulars included in that term. That is certain *which is, by necessary reference, made certain. When the act of 1790 declares, that any person who shall commit the crime of robbery or murder, on the high seas, shall be deemed a pirate, the crime is not less clearly ascertained, than it would be by using the definitions of these terms as they are found in our treatises of the common law. In fact, by such a reference, the definitions are necessarily included, as much as if they stood in the text of the act. In respect to murder, where "malice aforethought" is of the essence of the offence, even if the common-law definition were quoted in express terms, we should still be driven to deny that the definition was perfect, since the meaning of "malice aforethought" would remain to be gathered from the common law. There would then be no end to our difficulties, or our definitions, for each would involve some terms which might still require some new explanation. Such a construction of the constitution is, therefore, wholly inadmissible. To define piracies, in the sense of the constitution, is merely to enumerate the crimes which shall constitute piracy; and this may be done, either by a reference to crimes having a technical name, and determinate extent, or by enumerating the acts in detail, upon which the punishment is inflicted.
It is next to be considered, whether the crime of piracy is defined by the law of nations with reasonable certainty. What the law of nations on this subject is, may be ascertained by consulting the works of jurists, writing professedly on public laws; or by the general usage and practice *161] of nations; or by judicial *decisions recognising and enforcing that law. There is scarcely a writer on the law of nations, who does not allude to piracy, as a crime of a settled and determinate nature; and whatever may be the diversity of definitions, in other respects, all writers concur, in holding, that robbery, or forcible depredations upon the sea, animo furandi, is piracy. The same doctrine is held by all the great writers on maritime law, in terms that admit of no reasonable doubt.[(a)] The common law, too, recognises and punishes piracy as an offence, not against its own municipal code, but as an offence against the law of nations (which is part of the common law), as an offence against the universal law of society, a pirate being deemed an enemy of the human *75 race. Indeed, until the statute of 28 Hen. VIII., ch. 15, piracy was punishable, in England, only in the admiralty, as a civil law offence; and that statute, in changing the jurisdiction, has been universally admitted not to have changed the the nature of the offence. Hawk. P.C. ch. 37, § 2; 3 Inst. 112. Sir CHARLES HEDGES, in his charge at the admiralty sessions, in the case of Rex v. Dawson (5 State Trials 1), declared in emphatic terms, that "piracy is *only a sea term for robbery, piracy being a robbery [*162 committed within the jurisdiction of the admiralty." Sir LEOLINE JENKINS, too, on a like occasion, declared that "a robbery, when committed upon the sea, is what we call piracy;" and he cited the civil law writers, in proof. And it is manifest from the language of Sir WILLIAM BLACKSTONE (4 Bl. Com. 73), in his comments on piracy, that he considered the common-law definition as distinguishable in no essential respect from that of the law of nations. So that, whether we advert to writers on the common law, or the maritime law, or the law of nations, we shall find, that they universally treat of piracy as an offence against the law of nations, and that its true definition by that law is robbery upon the sea. And the general practice of all nations, in punishing all persons, whether natives or foreigners, who have committed this offence, against any persons whatsoever, with whom they are in amity, is a conclusive proof, that the offence is supposed to depend, not upon the particular provisions of any municipal code, but upon the law of nations, both for its definition and punishment. We have, therefore, no hesitation in declaring, that piracy, by the law of nations, is robbery upon the sea, and that it is sufficiently and constitutionally defined by the fifth section of the act of 1819.
Another point has been made in this case, which is, that the special verdict does not contain sufficient facts upon which the court can pronounce that the *prisoner is guilty of piracy. We are of a different opinion. [*163 The special verdict finds that the prisoner is guilty of the plunder and robbery charged in the indictment; and finds certain additional facts, from which it is most manifest, that he and his associates were, at the time of committing the offence, freebooters, upon the sea, not under the acknowledged authority, or deriving protection from the flag or commission, of any government. If, under such circumstances, the offence be not piracy, it is difficult to conceive any which would more completely fit the definition.
It is to be certified to the circuit court, that upon the facts stated, the case is piracy, as defined by the law of nations, so as to be punishable under the act of congress of the 3d of March 1819.[(a)]
*76 *164 *LIVINGSTON, Justice. (Dissenting.)
In a case affecting life, no apology *165] can be necessary for expressing *my dissent from the opinion which has just been delivered.
*77 *The only question of any importance in this case is, whether the *166 act of the 3d of March 1819, be a *constitutional exercise of the [*167 power delegated to congress of "defining and punishing piracies?" *78 *168 *The act declares, that any person who shall commit on the high seas *169] the crime of piracy, as defined by the *law of nations, shall be punished with death. The special power here given to define piracy, can *79 be attributed *to no other cause, than to the uncertainty which it was *170 known existed on this subject in the *law of nations, and which it [*171 must have been the intention of the framers of the constitution to *80 *172 remove, *by conferring on the national legislature the power which has *173] been mentioned. It was well known to *the members of the federal convention, that in treatises on the law of nations, or in some *81 of them, at *least, definitions of piracy might be found; but it must have *174 been as well known to them, that there *was not such a coincidence [*175 on this subject, as to render a reference to that code a desirable *82 *176 or safe mode *of proceeding in a criminal, and especially, in a capital *177] case. If it had been intended to adopt the definition *or definitions of this crime, so far as they were to be collected from the different *83 commentators on *this code, with all the uncertainty and difficulty attending *178 a research for that purpose, it might as well *at once have [*179 been adopted as a standard by the constitution itself. The object, *84 *180 therefore, of refering *its definition to congress was, and could have been no other than, to enable that body, to select from sources it might think proper, and then to declare, and with reasonable precision to define, what act or acts should constitute this crime; and having done *181] *so, to annex to it such punishment as might be thought proper. Such a mode of proceeding would be consonant with the universal practice in this country, and with those feelings of humanity which are ever opposed to the putting in jeopardy the life of a fellow-being, unless for the contravention of a rule which has been previously prescribed, and in language so plain and explicit as not to be misunderstood by any one. Can this be the case, or can a crime be said to be defined, even to a common intent, when those who are desirous of information on the subject are referred to a code, without knowing with any certainty, where it is to be found, and from which even those to whom it may be accessible, can with difficulty decide, in many cases, whether a particular act be piracy or not? Although it cannot be denied, that some writers on the law of nations do declare what acts are deemed piratical, yet it is certain, that they do not all agree; and if they did, it would seem unreasonable, to impose upon that class of men, who are the most liable to commit offences of this description, the task of looking beyond the written law of their own country for a definition of them. If in criminal cases everything is sufficiently certain, which by reference may be rendered so, which was an argument used at bar, it is not perceived, why a reference to the laws of China, or to any other foreign code, would not have answered the purpose quite as well as the one which has been resorted to. It is not certain, that on examination, the crime would not be found to be more accurately defined in the code thus referred to, than *182] in any writer on the law *of nations; but the objection to the reference is in both cases the same; that it is the duty of congress to incorporate into their own statutes a definition in terms, and not to refer the citizens of the United States for rules of conduct, to the statutes or laws of any foreign country, with which it is not to be presumed that they are acquainted. Nor does it make any difference, in this case, that the law of nations forms part of the law of every civilized country. This may be the case, to a certain extent; but as to criminal cases, and as to the offence of piracy, in particular, the law of nations could not be supposed, of itself, to *85 form a rule of action; and therefore, a reference to it in this instance, must be regarded in the same light, as a reference to any other foreign code. But it is said, that murder and robbery have been declared to be punishable by the laws of the United States, without any definition of what act or acts shall constitute either of these offences. This may be; but both murder and robbery, with arson, burglary, and some other crimes, are defined by writers on the common law, which is part of the law of every state in the Union, of which, for the most obvious reasons, no one is allowed to allege his ignorance, in excuse for any crime he may commit. Nor is there any hardship in this, for the great body of the community have it in their power to become acquainted with the criminal code under which they live; not so, when acts which constitute a crime are to be collected from a variety of writers, either in different languages, or under the disadvantage of translations, and from a code with whose provisions even professional *men are not [*183 always acquainted. By the same clause of the constitution, congress have power to punish offences against the law of nations, and yet it would hardly be deemed a fair and legitimate execution of this authority, to declare, that all offences against the law of nations, without defining any one of them, should be punished with death. Such mode of legislation is but badly calculated to furnish that precise and accurate information in criminal cases, which it is the duty, and ought to be the object, of every legislature to impart.
Upon the whole, my opinion is, that there is not to be found in the act that definition of piracy which the constitution requires, and that, therefore, judgment on the special verdict ought to be rendered for the prisoner.
CERTIFICATE.  This cause came on to be heard, on the transcript of the record of the circuit court of the United States for the district of Virginia, and on the question on which the judges of that court were divided in opinion, and was argued by counsel: on consideration whereof, this court is of opinion, that the offence charged in the indictment in this case, and found by the jury to have been committed by the prisoner, amounts to the crime of piracy, as defined by the law of nations, so as to be punishable under the act of congress, entitled, "an act to protect the commerce of the United States and punish the crime of piracy." All which is ordered to be certified to the circuit court for the district of Virginia.[(a)]
NOTES
[(a)] Santerna (lib. 4, note 50), for instance, says, "inter piratam et latronem, non sit alia differentia, nisi quia pirata depredator est in mari et potest dici fur et latro maris, quia latrocinium et furtum sicut fit in terra, sic fit in mari." And Emerigon (1 Emerig. Assur. ch. 12, § 29, p. 523), "la piraterie est un brigandage sur mer. Le Brigandage, sur terre est appellé vol ou rapine." So, Straccha, "pirat sunt latrones maritimi."
[(a)] To show that piracy is defined by the law of nations, the following citations are believed to be sufficient:

Grotius (lib. 3, c. 3, § 1) says, "Supra dicere incepimus justum bellum apud probos auctores dici sæpe, non ex causa unde oritur, neque ut alias ex rerum gestarum magnitudine, sed ob peculiares quosdam juris effectus. Quale autem sit hoc bellum optime intelligitur ex hostium definitione apud Romanos juris-consultos: Hostes sunt, qui nobis, aut quibus nos publice bellum decernimus; cæteri, latrones aut prædones sunt, ait Pomponius (Dig. lib. 50, tit. 16, 1. 118), nec aliter Ulpianus (Dig. lib. 49, tit. 15, 1. 24), hostes sunt, quibus bellum publice populus Romanus decrevit, vel ipsi populo Romano; cæteri latrunculi vel prædones appellantur. Et idio, qui à latronibus captus est servus latronum non est, nec postliminium illi, necessarium est. Ab hostibus autem captus; puta à Germanis et Parthis et servus est hostium, et postliminio statum pristinum recuperat. Et Paulus (Dig. lib. 49, tit. 15, l. 19, § 2), a piratis aut latronibus capti liberi permanent. Accedat illud Ulpiani; in civilibus dissentionibus quamvis sæpe per eas respublica lædatur, non tamen in exitium reipublicæ contenditur; qui in alterutras partes discedent, vice hostium non sunt eorum, inter quos jura captivitatum aut postliminiorum fuerint; et idio captos, et venundatos, posteaque manumissos placuit supervacuo repetere a principe ingenuitatem, quam nulla captivitate amiserant (Dig. lib. 49, tit. 15, l. 321, § 2).
Grotius adds (§ 2), "Illud tantum notandum, sub exemplo populi Romani quemvis intelligi, qui in civitate summum imperium habeat." Again, he says (§ 2), "Non autem statim respublica aut civitas esse desinit, si quid admittat injustum, etiam communiter; nec coetus piratarum aut latronum civitas est, etiamsi forte æqualitatem quandam inter se servent, sine qua nullus coetus posset consistere. Nam hi criminis causa sociantur; illi etsi interdum delicto non vacant juris tamen fruendi causa sociati sunt, et exteris jus reddunt, si non per omnia secundum jus naturæ, quod multos apud populos ex parte quasi obliteratum alibi ostendimus, certe secundum pacta cum quibus que inita, aut secundam mores." Again, he says (§ 2), "A latronibus captos capientium non fieri, supra dicentem audivimus Ulpianum. Idem captos á Germanos ait libertatem amittere. Atqui apud Germanos latrocinia, quæ extra civitatis cujusque fines fiebant, nullam habebant infamiam, quæ verba sunt Cæsaris, etc. Idem alibi Cattos nobilem Germaniæ populum latrocinia agitasse dicit. Apud eundem Geramantes latrociniis facunda gens; sed gens tamen. Illyrici sine discrimine maris proedas agere soliti; de iis tamen triumphus fuit; Pompeio de piratis non fuit. Tantum discrimen est inter populum quantumvis sceleratum et inter eos, qui, cum populus non sint, sceleris causa coiunt."
Again, he says (lib. 3, c. 9, § 16), "Eae vexo res quæ intra presidia perductæ nondum sunt, quanquam ab hostibus occupatæ, ideo postliminii non egent, quia dominum nondum mutarunt, ex gentium jure. Et quæ piratæ aut latrones nobis eripuerunt non opus habent postliminis, ut Ulpianus et Javolenus responderunt; quia jus gentium illis non concessit ut just domini mutare possint, &c. Itaque res ab illis captæ ubicunque reperiunter vindicari possunt, nisi quod ex naturali jure alibi censuimus ei qui suo sumtu possessionem rei adeptus est tantum esse reddendum, quantum dominus ipse ad rem recuperandam libenter impensurus fuerat." And (Ibid. § 17), "Potest tamen lege civili aliud constitui; sicuti lege Hispanica naves a piratis captæ eorum flunt, qui eas eripiunt piratis; neque enim iniquum est, ut privata res publicæ utilitati cedat, presertim in tanta recuperandi difficultate. Sed lex talis non obstabit exteris quo minus res suas vindicent."
Again, he says (lib. 2, c. 17, § 20), "Ex neglectu tenuntur reges ac magistratus, qui ad inhibenda latrocinia et piraticam non adhibent ea quae possunt ac debent remedia; quo nomine damnati olim ab Amphictionibus Scyrii. Quae potestatem predarum in maris ex hoste agendarum per codicillos plurimis dedissent, et eorum nonnulli res amicorum rapuissent, desertaque patriae mari vagarentur ac ne revocati quidem redirent, an rectores eo nomine tenerentur, aut quod malorum hominum usiessent opera, aut quod cautionem non exigissent. Dixi eos in nihil amplius teneri quam ut noxios, si reperiri possent, punirent, aut dederent; præterea in bona raptorum jus reddi curarent." Again, he says (Id. c. 18, § 2, 3), "Piratæ et latrones qui civitatem non faciunt, jure gentium niti non possunt, &c. Sed interdum tales qui sunt jus legationis nanciscuntur fide data, ut olim fugitivi in saltu Pyrenæo." Again (lib. 3, c. 13, § 15), "Repudiandus ergo Cicero (De Offic. lib. 3, cap. 29), cum ait perjurium nullum esse predonibus pactum pro capite pretium non adservatur, nec si juratum quidem sit; quia pirata non sit ex perduellium numero desinitus, sed communis hostis omnium, eum quo nec fides esse debeat, nec jus jurandum commune, &c. Atque sicut in jure gentium constituto differe hostem a pirata verum est, et a nobis infra ostendetur; ita hic ea differentia locum habere non potest, ubi, etsi personae jus deficiat cum Deo negotium est; qua de causa juramentum votinomine nuncupatur. Neque id quod sumit Cicero verum est, nullum esse cum prae done juris societatem. Nam depositum ex ipso gentium jure reddendum latroni, si dominus non apparet recte Tryphonino responsum est."
These passages abundantly show the opinion of Grotius, that piracy, by the law of nations, is the same thing as piracy by the civil law; and though he nowhere defines the crime, in precise terms, yet there seems to be no doubt as to what he understood to be comprehended in that crime. Pirat, latrones, prdones, are used to denote the same class of offenders; the first term being generally applied to robbers or plunderers on the sea, and the others to robbers or plunderers on land. The terms are, indeed, convertible in many instances, in the civil law. Thus, in the title, De Lege Rhodia de Jactu (Dig. lib. 14, tit. 2, § 3), it is said: "Si navis a piratis redempta sit, Servius, Osilius, Labeo, omnes conferre debere aiunt. Quod vero praedones abstulerint, cum perdere cujus fuerit, nec conferendum ei qui suas merces redimerit."
Bynkershoek (Quæst. Jur. Pub. c. 17), treating on the subject of piracy, says: "interest scire qui piratæ ac latrones sunt, nam ab his capta dominium non mutant neque adeo postliminio egent. Sic docet ratio; sic auctoritas juris in l. 19, § 2, l. 24, and l. 27, de Capt. et Postlim. Rev. (Dig. lib. 49, tit. 15) et sic ex pactis quarandam gentium supra probavi. Non est igitur ut addam auctoritates Grotii de Jure B. et P., l. 3, c. 9, § 16; Alberici Gentilis, de Jure Belli, lib. 1, c. 4; Zoucheii, de Jure Feciali, p. 2, § 8, qu. 15, aliorumque plurium in eandem sententiam. Qui autem nullius principis auctoritate sive mari sive terra, rapiunt, piartarum praedonumque vocabulo intelliguntur."
Azuni (part 2, c. 5, § 3) says: "A pirate is one who roves the sea in an armed vessel, without any commission or passport from any prince or sovereign state, solely on his own authority, and for the purpose of seizing by force, and appropriating to himself, without discrimination, every vessel he may meet. For this reason, pirates have always been compared to robbers. The only difference between them is, that the sea is the theatre of action for the one, and the land for the other." (§ 11.) "Thus, as pirates are the enemies of the human race, piracy is justly regarded as a crime against the universal laws of society, and is everywhere punished with death. As they form no national body, as they have no right to arm, nor make war, and on account of their indiscriminate plunder of all vessels, are considered only as public robbers, every nation has a right to pursue, and exterminate them, without any declaration of war. For these reasons, it is lawful to arrest them, in order that they may undergo the punishment merited by their crimes." (§ 12.) "Pirates having no right to make conquests, cannot, therefore, acquire any lawful property in what they take; for the law of nations does not authorize them to deprive the true owner of his property, who always retains the right of reclaiming it, wherever it may be found. Thus, by the principles of common law, as well as the law of nature, at whatever period, or in whatever manner, things taken by a pirate may be recovered, they return again to their former owners, who lose none of their rights, by such unjust usurpation." (See Azuni, part 2, c. 5, art. 3, p. 351, 361, Mr. Johnson's translation.)
Lord Bacon, in his dialogue de Bello Sacro says, "Indubitatum semper fuit, bellum contra piratus juste geri posse per nationem quamcumque, licet ab iis minime infestatam et læsam, &c., &c. Vera enim causa hujus rei hæc est, quod piratæ communes humani generis hostes sint; quos id circo omnibus nationibus persequi incumbit, non tam propter metus proprios quam respectu fderis inter homines sociales. Sicut enim quædam sunt fderis inscriptis et in tractatus redacta contra hostes particulares inita; ita naturalis et tacita confderatio inter omnes homines intercedit contra communes societatis humanæ hostes." (10 Bac. Works, 313, 314, ed. 1803.) Martens, in his Essay on Privateers, Captures and Re-captures (c. 1, § 1), says, "L'armateur differe du pirate, (1) Le premier est muni d'une commission ou de lettres de marque du souverain, dont le pirate est destitué. (2) L'armateur suppose le cas d'une guerre, (ou du moins celui de represailles,) le pirate pille au sein de la paix comme au milieu de la guerre. (3) L'armateur s'oblige d'observer les ordonnances et les instructions qui lui ont été donneés, et de n'attaquer qu'en consequence de celles ci de l'ennemi, et ceux des vaisseux neutres qui font un commerce illicite, le pirate pille indistinctement les vaisseaux de toutes les nations, sans observer même les loix de la guerre."
Rutherforth (Inst. b. 2, c. 9, § 9, p. 481), speaking with reference to the law of nations, says, "All wars of a nation against its external enemies are not public wars. To make a war a public one, both the contending parties must be public persons; that is, it must be a war of one nation against another, &c. Where a nation makes war upon pirates or other robbers, though these are external enemies, the war will be a mixed one; it is public on one side, because a nation or public person is one of the parties; but it is private on the other side, because the parties on this side are private persons, who act together occasionally, and are not united into a civil society. A band of robbers or a company of pirates may, in fact, be united to one another by compact, &c. But they are still, by the law of nature, only a number of unconnected individuals; and consequently, in the view of the law of nations, they are not considered as a collective body or public person. For the compact by which they unite themselves is void, because the matter of it is unlawful, &c. The common benefit which a band of robbers, or a company of pirates, propose to themselves, consists in doing harm to the rest of mankind."
Wooddeson (Lect. 34, vol. 2, 422), treating on captures at sea, after stating that the law of nations is part of the law of England, and that captures at sea may happen either by pirates, or by way of reprisal, or as prize of war, says, "piracy, according to the law of nations, is incurred by depredations on or near the sea, without authority from any prince or state." He then quotes the opinion of Sir Leoline Jenkins, with approbation, that it is piracy, not only when a man robs, without any commission at all, but when, having a commission, he despoils those with whom he is not warranted to fight or meddle, such as are de legantia vel amicitia of the prince or state which hath given him his commission. He then adds, "but according to the judgments of our domestic tribunals, a bare assault, without taking or pillaging something away, does not constitute the crime, though Molloy pretends, that by the law of nations, it is otherwise. Yet it does not seem necessary that any person should be on board the pillaged vessel." "If these violations of property be perpetrated by any national authority, they are the commencement of a public war; if without that sanction, they are acts of piracy." He then proceeds to state several cases which had arisen in the admiralty of England, and sums up his remarks as follows: "The foregoing particulars are the more deserving of consideration, because it seems agreed, that when a piratical taking is ascertained, it becomes a clear and indisputable consequence, that there is no transmutation of property. No right to the spoil vests in the piratical captor; no right is derivable from them to any re-captors, in prejudice of the original owners. These piratical seizures being wholly unauthorized, and highly criminal, by the law of nations, there is no pretence for divesting the dominion of the former proprietor. This principle, therefore, `a piratis et latronibus capta dominium non mutant,' is the received opinion of ancient civilians and more modern writers on general jurisprudence. The same doctrine was maintained in our courts of common law, long antecedent to the great cultivation and improvements made in the science of the law of nations. And he remarks in a note (p. 427, note n), "I have looked into the indictment against Luke Ryan, tried at the admiralty sessions, March 1782, for piracy, and who is alleged to have had a Dutch commission. He was indicted, not for piracy, generally, by the law of nations, but for that, being a natural-born subject, he piratically, &c., against the form of the statute." From the whole scope of Mr. Wooddeson's observations on the subject of piracy, it is very clear, that he considered piracy, as punishable by the law of the admiralty, to be no other than piracy by the law of nations. The definition of piracy, and Mr. Wooddeson's comments, are cited with approbation by Mr. Gwillim, in his late edition of Bacon's Abridgment. (5 Bac. Abr. 310, ed. 1807, London.)
Burlamaqui (part 2, c. 7, § 41) says: "Lastly, as to the wars of robbers and pirates, if they do not produce the effects above mentioned (transmutation of property on capture), nor give to those pirates a right of appropriating what they have taken, it is because they are robbers and enemies of mankind, and consequently, persons whose acts of violence are manifestly unjust, which authorizes all nations to treat them as enemies."
Thus far, the authorities cited are such as profess to treat of piracy in terms, according to the law of nations, the notion of which was manifestly derived from the civil law, "on which," as Sir WILLIAM SCOTT observes (The Maria, 1 Rob. 340), "great part of the law of nations is founded." Indeed, in the law of England, it is treated altogether as a civil-law offence, and referred to that law for its definition and punishment. Piracies and depredations at sea are capital offences by the civil law. (5 Bac. Abr. Piracy, 311, Ed. ubi supra; 3 Inst. 112; Hawk. P.C. c. 37; 2 East P.C. 796; 4 Bl. Com. 72.) The commentaries of the common-law writers on the subject of piracy will be more fully considered hereafter.
Let us now advert to the definations of the civil law and maritime writers. In the Novels (Nov. 134, tit 17, c. 13), it is declared, "Pro furto autem nolumus omnino quodlibet membrum abscindi, aut mori; sed aliter eum castigari. Fures autem vocamus qui occulte et sine armis hujusmodi delinquunt. Eos vero, qui violenter aggrediuntur aut cum armis aut sine armis in domibus aut itineribus aut in mari pnis eos legalibus subdi jubemus."
Calvinus, in his Lexicon Juridicum, says: "Piratæ dicuntur prædatores marini; sic dicti vel a pirata, qui prius maria infestavit, vel a Graeco περανω id est, transeo, quod conspecta insula in illam transirent, jam prædaturi. Hinc piratica ars est, quam exercent." In the French Code des Prises (Edition of M. Dufriche Foulaines, Paris, 1804, tom, 1, p. 6), the editor says: "Le pirate est celui qui parcourt les mers avec une batiment armé sans commission ou patente d'aucune etat, dans la vue exclusive de s'approprier tous les navires par la force. La piraterie est un assassinat; tout puissance doit faire arreter et juger des pareils brigands, et en purger la terre." Emerigon (Assur. tom. 1, c. 12, § 28, p. 523) says: "Les pirates sont ceux qui courent les mers sans commission d'aucun prince ni etat souverain pour depreder las vaisseaux qu'ils rencontrent." "Les ennemis sont ceux, qui autorisés par un prince, on etat souverain font la guerre dans la forme établie par le droit des gens; au lieu que les pirates sont de simples particuliers qui depredent le premier navire qu'ils recontrent." "Les hostilités se commettent de nation á nation; au lieu que la piraterie est un brigandage qui s'exerce sur mer par gens sans aveu, et d'une maniere furtive." "Les pirates sont ennemis du genre humain." "La piraterie, on le brigandage sur mer, est un delit contre la loi universelle des societies," &c. And Emerigon fortifies his opinion on this subject, by citations from the civil law, from other maritime writers, and from Blackstone's Commentaries. It is plain, therefore, that he considered piracy as defined in the civil law, the maritime law, and the common law of England, as the same crime.
Bouchard (cited in 1 Emerigon, c. 12, § 23, p. 527), "Les pirates n'ont pas le droit des armes. Ce sont des voleurs et assassins, qui ne forme pas un corps d'etat. Ennemis des toutes les nations contre lesquelles ils exercent indistinctement leurs brigandages, toutes les nations sont en droit de courir sus, et de les exterminer sans declaration de guerre."
M. Bonnemant, in his edition of the Chevalier De Habreu's Treatise on Maritime Captures (Ed. 1802, Paris, part 1, c. 1, § 5, p. 15, note), says, "les pirates sont ceux dont la navigation, les actions et les entreprises ne sont autoriseés ni avoneés par aucune puissance, qui agissent sur la propriété publique et particuliére contre le vu de toutes les nations." And De Habreu himself (as translated by M. Bonnemant, part 2, c. 6, § 1, p. 100, 101), says. "Selon la définition de la prise, il paroît que le droit d'armer en course n'appartient qu'à ceux qui sont ennemis autorisés, appellés en Latin, hostes. D'ou il s'ensuit que les brigands et les pirates sont exclus de ce droit; qu'ils ne peuvent prétendre aux privilèges que les loix de la guerre accorde aux ennemis, et qu'au contraire ils méritent d'être punis rigoureusement comme les malfaiteurs, et qu'on est autorisé à se saisir de tous leurs biens." "De tous les tems les pirates ont été regardés comme des voleurs publics et des perturbateurs de la paix. C'est pour cela qu'il est libre à quiconque s'en saisit de leur ôter la vie sans se rendre coupable d'injustice. La prejudice qu'ils causent à la tranquillité publique, á la liberté du commerce, et à la sûreté de la navigation, a fait que toutes les nations se sont accordées à les poursuivre et à les punir avec la plus grande rigueur."
"Ferriere (Dict. du Droits, art. Pirates) says, "Pirates sont des corsaires, ecumeurs de mer, qui font des courses sur mer sans aveu ni autorité du prince ou du souverain."
In the Encyclopedie des Sciences, &c. (Ed. 1765, art. Pirate), it is said, "On donne ce nom (Pirate) à des bandits, qui maitres d'une vaisseau vont sur mer attaquer les vaisseaux marchands pour les piller et les voler."
Valin (Traité des Prises, c. 3, § 2, p. 29) says, "Or la peine des pirates ou forbans est celle du dernier supplice, suivant l'opinion commune; parceque ce sont des ennemis declarés de la societé, des violateurs de la foi publique and du droit des gens, des voleurs publiques à main armé et à force ouverte."
Straccha says (De Naut. part 3, n. 30), "Inter piratam et latronem nulla alia est differentia nisi quia pirata depraedator est in mari." Casaregis (Disc. 64, n. 4) says, "Proprie pirata ille discitur qui sine patentibus alicujus principis ex propria tantum et privata auctoritate per mare discurrit depredendi causâ." Dr. Brown (2 Civ. & Adm. Law 461, 462) says, "Piracy is depredation without authority from any prince or state, or transgression of authority, by despoiling beyond its warrant." "Unlawful depredation is of the essence of piracy." Beawes (Lex Mercatoria, art. Piracy, p. 250) says, "A pirate is a sea-thief, or an enemy of human kind, who also aims at enriching himself by marine robberies committed either by force, fraud or surprise, on merchants or other traders at sea." Molloy (b. 1, c. 4, § 1) says, "A pirate is a sea-thief, or hostis humani generis, who, for to enrich himself either by surprise, or open force, sets upon merchants or others trading at sea, ever spoiling their lading, if by possibility they can get the mastery." Marshall (Insur. c. 12, § 11, p. 556) says, "The crime of piracy or robbery on the high seas, is an offence against the universal law of society."
It is also said in 16 Viner's Abridgment (art. Pirate and Piracy, A, p. 556) and in Cowell's Interpreter (Pirate): "A pirate is now taken for one who maintains himself by pillage and robbery at sea." Comyn (Dig. Admiralty, E, 3) defines piracy thus: "Piracy is when a man commits robbery upon the sea;" and he cites as authority, 3 Inst. 113, and 1 Sir L. Jenk. 94. Lord Coke says (3 Inst. 113, Co. Litt. 391), "This word pirate, in Latin, pirata, from the Greek word πειρατησf; which again comes from πειραν, a transcendo mare, of roving upon the sea; and therefore, in English, is called a rover and robber upon the sea."
Sir Leoline Jenkins, in his charge at the admiralty sessions, in 1668, says: "You are, therefore, to inquire of all pirates and sea rovers, they are in the law hostes humani generis, enemies, not of one nation, or of one sort of people only, but of all mankind. They are outlawed, as I may say, by the laws of all nations; that is, out of the protection of all princes, and of all laws whatsoever. Everybody is commissioned, and is to be armed against them, as rebels and traitors, to subdue and root them out. That which is called robbing upon the highway, the same being done upon the water, is called piracy. Now, robbery, as it is distinguished from thieving or larceny, implies not only the actual taking away of my goods, while I am, as we say, in peace, but also, the putting me in fear, by taking them by force and arms, out of my hands, or in my sight and presence. When this is done upon the sea, without a lawful commission of war or reprisals, it is downright piracy." (Vol. 1, p. 86.)
Again, in another charge, he says: (vol. 1, p. 94) "The next sort of offences pointed at in the statute (28 Hen. VIII., ch. 15) are robberies; and a robbery, when it is committed upon the sea, is what we call piracy. A robbery, when it is committed upon the land, does imply three things: 1. That there be a violent assault; 2. That a man's goods be actually taken from his person or possession; 3. That he who is despoiled be put in fear thereby. When this is done upon the sea, when one or more persons enter on board a ship, with force and arms, and those in the ship have their ship carried away by violence, or their goods taken away out of their possession, and are put in fright by the assault, this is piracy; and he that does so, is a pirate or a robber within the statute."
The statute of Henry VIII., here referred to, does not contain any description of piracy. Before that statute, piracy was only cognisable by the civil law, in the admiralty court. But the statute gave the high commission court (created by that statute) jurisdiction of "all treasons, felonies, robberies, murders and confederacies committed in or on the sea," &c. The term piracy is not found in the statute, and it is only as a robbery upon the sea that the high commission court has jurisdiction of piracy. Sir Leoline Jenkins, therefore, refers to the civil-law definition of the offence of piracy; for it is agreed on all sides, that the statute of Henry VIII. has not altered the nature of the offence. (See 1 Hawk. P.C. b. 1, c. 37.)
Targa (as I find him quoted by his Spanish translator, Gison, Reflex. c. 61, De los Corsarios o Pyratas, for the original is not before me) says, "Esta (depredacion) se comete de dos modos, o por causa de guerra declarada entre dos naciones, &c., o por modo de hurto violento como ladrones del mar y como hacen los robos en terra los salteadores de caminos; y esto se compuela con la authentica del derecho civil,¹ que distingue la pyrateria del robo," &c. Again, "A los pyratas como tamblen a los salteadores de camino, enemigos comunes, opresores de la libertad y comercio, y como a violadores del derecho de las gentes, puede qualquiera oponerse y los ministros y subditos del principe pueden perseguir los y prender los aunque sea fuera del dominio y se hayan refugiado a los estados confinantes, sin que per esso quede violada la jurisdiccion; y presas que sean, se pendran en poder de la justicia de aquel principe en cuyo estado han sido cogidos." Again, "Y assi concluyo, diciendo, que deben todos guardarse en el mar de pyratas, y en la tierra de ladrones; y todo aquel, que en el mar, playa, puerto, ó otro seno de mar, ó rio navigable, roba ó apresa, ya sea amigo, esto es; enemigo no declarado, y tambien los paysanos, ó enemigos propriamente tales, ó con patente, estandarte, ó sin el, ó con engano, ó fuerza, siempre es pyrata."
Citations from civilians and maritime writers to the same effect might be multiplied; but they would unnecessarily swell this note. It remains only to notice the doctrines which have been held by the tribunals of Great Britain, and asserted by her common-law writers on the subject of piracy. Hawkins (P.C. b. 1, c. 37) says, "A pirate, at the common law, is a person who commits any of those acts of piracy, robbery and depredation, upon the high seas, which, if committed upon land, would have amounted to felony there." From the terms of this definition (if it may be so called), it might be supposed, that by piracy, at the common law, something was meant peculiar to that law, and not piracy by the civil law, or the law of nations. But that was certainly not the meaning of the writer. For it is perfectly well settled, that piracy is no felony at common law, being out of its jurisdiction; and before the statute of 28 Henry VIII., c. 15, it was only punishable by the civil law. That statute, however, does not (as has been already stated) alter the nature of the offence in this respect; and therefore, a pardon of all felonies generally, does not extend to it. 2 East P.C. 796; 1 Hawk. c. 37, § 6, 8 10; 1 Hale 354; 2 Ibid. 18; 3 Inst. 112 And it was also determined in Rex v. Morphes (Salk. 85), that "no attainder for piracy wrought corruption of blood, for it was no offence at common law. 2 East, P.C. 796; Co. Litt. 391 a. The intention of Hawkins must have been, to use the phrase "at the common law," in its most comprehensive sense; in which sense, the law of nations itself is a part of the common law; since all offences against the law of nations are punishable by the criminal jurisprudence of England.
Blackstone, in the commentaries (4 Com. 71, 73), evidently proceeds upon this notion. He says, "The crime of piracy, or robbery and depredation upon the high seas, is an offence against the universal law of society, a pirate being, according to Sir Edward Coke, hostis humani generis." He goes on to remark, that every community hath a right to punish it, for it is a war against all mankind. He then gives the definition of piracy by Hawkins, as the definition of the common law; and then states the several statutes made in England on the subject of piracy, concluding thus: "These are the principal cases in which the statute law of England interposes to aid and enforce the law of nations, as a part of the common law, by indicting an adequate punishment for offences against that universal law committed by private persons."
The state trials for piracy, in the reign of William III., are entitled to great consideration, both from the eminent talents of the judges who constituted the tribunal, and the universal approbation of the legal principles asserted by them. It is also worthy of remark, that in none of these indictments was there any averment that the prisoners were British subjects; and most of them were for piracies committed on foreign subjects and vessels. They were all framed as indictments at common law, or for general piracy, without reference to any British statute. In Rex v. Dawson and others (8 Wm. III., 1696, 5 State Trials 1, ed. 1742), the court was composed of Sir Charles Hedges, Judge of the High Court of Admiralty (as president) Lord Chief Justice Holt, Lord Chief Justice Treby, Lord Chief Baron Ward, Mr. Justice Rookby, Mr. Justice Turton, Mr. Justice Eyre, Mr. Baron Powis, and Doctors Lane, King and Cook (civilians), Sir Charles Hedges delivered the charge to the grand jury, and among other things, directed them as follows: Now, piracy is only a sea term for robbery, piracy being a robbery committed within the jurisdiction of the admiralty. If any man be assaulted, within that jurisdiction, and his ship or goods violently taken away, without legal authority, this is robbery and piracy. If the mariners of a ship shall violently dispossess the master, and afterwards carry away the ship itself, or any of the goods, or tackle, apparel or furniture, with a felonious intention, in any place were the lord admiral hath, or pretends to have, jurisdiction, this is also robbery and piracy. The intention will, in these cases, appear, by considering the end for which the fact is committed, and the end will be known, if the evidence show you what hath been done. The king of England hath not only an empire or sovereignty over the British seas, for the punishment of piracy, but in concurrence with other princes and states, an undoubted jurisdiction and power in the most remote parts of the world. If any person, therefore, native or foreigner, Christian or infidel, Turk or pagan, with whose country we are in amity, trade or correspondence, shall be robbed or spoiled, in the narrow or other seas, whether the Mediterranean, Atlantic or Southern, or any branches thereof, either on this or the other side of the line, it is a piracy, within the limits of your inquiry, and cognisable by this court." It seems impossible to doubt, that Sir Charles Hedges here understood piracy to be punishable by all nations, as a crime against the law of nations, and that its true definition is the same in the civil and common law, as in the law of nations, viz., robbery upon the seas; and that, as such, it was punishable by the British courts, in virtue of their general concurrent jurisdiction on the seas.
In Rex v. Dawson and others, there were several indictments. 1. The first was for piracy in robbing and plundering the ship Gunsway, belonging to the Great Mogul and his subjects, in the Indian seas. 2. The second, for piracy, in forcibly seizing and feloniously taking, stealing and carrying away, a merchant ship called the Charles II., belonging to certain of his majesty's subjects unknown, on the high seas, about three leagues from the Groyne, in Spain. 3. The third was for piracy on two Danish ships. 4. The fourth for piracy on a Moorish ship. Dawson pleaded guilty; and the other prisoners not guilty, and were upon trial convicted, and all sentenced to death accordingly. It appeared in evidence, that the prisoners were part of the crew of the Charles II., and rose upon her, near the Groyne, and afterwards ran away with her, and committed the piracies. The solicitor-general, in stating the case to the jury, said, "they (the prisoners) are arraigned for a very high crime, a robbery upon the seas." "These are crimes against the law of nations, and worse than robbery on land." Lord Chief Justice HOLT, in delivering the charge to the jury, said, "that there was a piracy committed on the ship Charles, is most apparent, by the evidence that hath been given; that is, a force was put upon the master, and some of the seamen on board her, who because they would not agree to go on a piratical expedition, had liberty to depart and be set ashore, &c. So that I must tell you, beyond all contradiction, the force put upon the captain, and taking away this ship, called the Charles II., is piracy."
On the trial of Kidd and others, for piracy, &c., in 13th of William III., 1713 (5 State Trials, ed. 1742), there were several indictments. 1. The first was against William Kidd for the murder of one W. Moore, on the high seas, near the coast of Malabar, in a vessel called the Adventure Galley, of which Kidd was commander. 2. The second was against all the prisoners for piracy, in seizing and running away with a certain merchant ship called the Quedash Merchant, then being a ship of certain persons to the jurors unknown (not stated to be British subjects), upon the high seas, about ten leagues from Cutscheen, in the East Indies. In fact, the vessel and cargo appeared by the evidence to belong to Armenian merchants, and then on a voyage from Bengal to Surat. Lord Chief Baron WARD, in charging the jury on this indictment, said, "the crime charged upon them (the prisoners) is piracy, that is, seizing and taking this ship and the goods in it, piratically and feloniously. This ship belonged to people in amity with the king of England." "If this was a capture on the high seas, and these were the goods of persons in amity with the king, and had no French pass, then it is a plain piracy; and if you believe the witnesses, here is the taking of the goods and ship of persons in amity, and converting them to their own use. Such a taking as this would be felony; and being at sea, it will be piracy." The prisoners were convicted and sentenced to death. There were four other indictments, three for piracy on Moorish ships, and one for piracy on a Portuguese ship; and all the prisoners were convicted and sentenced. Mr. Justice TURTON, in charging the jury on one of these indictments, said, "pirates are called hostes humani generis, the enemies of all mankind." The case of Rex v. Green (4 Anne, 1704, 5 State Trials, 573, ed. 1742) was a libel or indictment in the court of admiralty, in Scotland, for piracy, manifestly treated both in the libel and the arguments, as a crime against the law of nations, and as such, also against the law of Scotland. In Erskine's Institutes of the Law of Scotland, in treating of the crime of piracy, the author says, "piracy is that particular kind of robbery which is committed on the seas." (Ersk. Inst. b. 4, tit. 4, § 65.) He had, in the preceding section (§ 64), declared, that, "robbery is truly a species of theft; for both are committed on the property of another, and with the same view of getting gain; but robbery is aggravated as by the violence with which it is attended." The definition of both these crimes seems not at all different from that of the common law.
The foregoing collection of doctrines, extracted from writers on civil law, the law of nations, the maritime law, and the common law, in the most ample manner confirms the opinion of the court in the case in the text; and it is with great diffidence submitted to the learned reader, to aid his future researches in a path, which, fortunately for us, it has not been hitherto necessary to explore with minute accuracy.
¹ Dig. lib. 49, tit. 15, l. 19, § 2.
[(a)] See Appendix, Note IV., for the new act of congress on the subject of piracy, passed May 15th, 1820.